# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2025 CJ 0167

## STATE OF LOUISIANA IN THE INTEREST OF K.C.N.

Judgment Rendered: __DEC 0 9 2025__

* * * * *

On Appeal from the 22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Trial Court No. JC-0123-2022

Honorable Scott Gardner, Judge Presiding

* * * * *

| | |
|---|---|
| Douglas Lee Harville<br>Shreveport, Louisiana<br>Terrell L. Dupard<br>Baton Rouge, Louisiana | Attorneys for Appellant<br>K.J., father of K.C.N. |
| Betsy H. Smith<br>Mandeville, Louisiana | Attorney for Appellee<br>K.C.N. |
| Sandra B. Terrell<br>Covington, Louisiana | Attorney for Appellee<br>State of Louisiana, Department of<br>Children and Family Services |
| J. Collin Sims<br>District Attorney<br>Brandi Dohre<br>Assistant District Attorney<br>Covington, Louisiana | Attorneys for Appellee<br>District Attorney for the 22nd<br>Judicial District |

* * * * *

**BEFORE: PENZATO, STROMBERG, AND FIELDS, JJ.**

Fields, J Dissents with Reasons

**PENZATO, J.**

A father appeals a judgment terminating his parental rights. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

K.C.N. was born on April 19, 2022, to A.N. while she was incarcerated at the St. Tammany Parish Jail. The Department of Children and Family Services (DCFS) received a report concerning K.C.N., as he was without a legal caretaker while A.N. remained in prison. A.N. was unwilling to provide information needed to ascertain the identity of K.C.N.'s father or possible family members. DCFS sought an instanter order, which was orally granted by the trial court on April 22, 2022, placing K.C.N. in the provisional custody of DCFS.

The District Attorney of the 22nd Judicial District Court, State of Louisiana, filed a child in need of care petition, and on June 22, 2022, the trial court adjudicated K.C.N. in need of care, ordered that K.C.N. remain in state custody, and approved DCFS's case plan with the goal of reunification. However, following an initial permanency hearing on April 19, 2023, the trial court approved the change of the case plan goal to adoption, finding adoption to be in the best interest of K.C.N.[1]

Around the time of the permanency hearing, K.J. was identified as K.C.N.'s potential father, and in June of 2023, DNA testing established him as the father. On July 5, 2023, K.J. was added to the child in need of care case by way of an amending petition. On November 2, 2023, K.J. filed a motion to vacate the adjudication of K.C.N. as a child in need of care and/or to modify the disposition to grant custody of K.C.N. to K.J. The motion came for hearing on November 29, 2023, along with a case review. K.J. testified at the hearing that he lived in New Orleans with his

---

[1] Ultimately, the parental rights of A.N. were terminated on August 25, 2023. A.N. unsuccessfully appealed the termination of her parental rights in a prior appeal. See *State in Interest of K.C.N.*, 2023-1144 (La. App. 1 Cir. 5/29/24), 2024 WL 2746505 (unpublished), writ denied, 2024-00837 (La. 9/4/24), 391 So. 3d 1059, cert. denied sub nom., *A.N. v. Louisiana Department of Children and Family Services*, ___ U.S.___, 145 S.Ct. 2708, 221 L.Ed.2d 970.

2

sixteen-year-old daughter. He testified that he had twelve children, with another due in January, and the parties stipulated that "there may have been many of those children who [were] not raised solely by him." According to K.J., he had never paid child support for any of his children. He testified that he received $980.00 per month in social security and SSI and made additional income breeding and selling "bullies," but did not report that income. K.J. testified he had been arrested "a few times" and "been in jail a few times." Evidence introduced at the hearing showed that he pled guilty to three counts of distribution of heroin in 2015 and served four years in federal prison. He also pled guilty to aggravated battery and attempted possession of a firearm in 1996, and in 2002 he pled guilty to possession of heroin, for which he was sentenced to five years in prison. In 2020, he was arrested on charges of domestic abuse battery, and pled guilty to the lesser offense of disturbing the peace. K.J. testified that since he learned he was K.C.N.'s father, he had seen K.C.N. two or three times, "for like, an hour." When asked why he believed it would be appropriate for him to have custody of K.C.N., K.J. answered, "He's my son." At the conclusion of the hearing, K.J. withdrew the motion to vacate the adjudication and/or modify the disposition. The case review judgment, signed December 18, 2023, ordered that K.C.N. remain in the custody of DCFS and that the goal of adoption continued to be approved and accepted.

A permanency review hearing for K.J. was held on April 10, 2024. Following the hearing, the trial court found that DCFS had made reasonable efforts to reunify the parent and child, considering the child's health and safety, and continued with the plan for adoption of K.C.N.[2]

On June 7, 2024, a petition for termination of K.J.'s parental rights was filed on behalf of K.C.N., asking that K.J.'s rights be terminated pursuant to La. Ch.C.

_____

[2] K.C.N. remained in the same certified foster home since birth.

3

art. 1015(4)(b),[3] for abandonment of K.C.N. by failing to provide significant contributions to his care and support for the period of July 5, 2023 through January 29, 2024.

The trial court held a hearing on the petition for termination of parental rights on September 25, 2024. At the conclusion of the hearing, the trial court ordered the parties to file post-trial briefs. Thereafter, the trial court signed a judgment on October 7, 2024, terminating K.J.'s parental rights pursuant to La. Ch.C. art. 1015(4)(b), finding that it was in K.C.N.'s best interest pursuant to La. Ch.C. art. 1037, as he was thriving in his current adoptive placement. The trial court issued reasons for judgment on October 10, 2024.

K.J. appeals, contending the trial court erred in finding he failed to make parental contributions for any six-month period prior to the filing of the petition to terminate K.J.'s parental rights and that termination was in K.C.N.'s best interest.

## DISCUSSION

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. Under La. Ch.C. art. 1001, the purpose of a termination of parental rights proceeding is to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs. In all proceedings, the primary concern is to secure the best interest of the child if a ground justifying termination of parental rights is proved. Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if possible, to achieve the child's adoption. The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. *State in Interest of C.F.*, 2017-1054 (La. 12/6/17), 235

---

[3] Louisiana Children's Code article 1015 was amended by La. Acts 2023, No. 271, § 1, effective June 9, 2023. Act 271 renumbered article 1015, such that subparagraph (5) is now subparagraph (4). The petition incorrectly referred to this section as Article 1015(5)(b).

So. 3d 1066, 1075. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. *Id.* A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to ensure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them. *Id.*

Louisiana Children's Code article 1015 provides the statutory grounds by which a court may involuntarily terminate the rights of parents. In order to terminate a person's parental rights, the court must find the State has established at least one of the statutory grounds contained in Article 1015 by clear and convincing evidence. See La. Ch.C. art. 1035(A); *State in Interest of C.F.*, 235 So. 3d at 1072. Even upon finding the State has met its evidentiary burden, a court may not terminate parental rights unless it determines that to do so is in the child's best interest. See La. Ch.C. art. 1037(B). Whether termination of parental rights is warranted is a question of fact, and a trial court's factual determinations will not be set aside in the absence of manifest error. *State in Interest of E.O.*, 2018-1093 (La. App. 1 Cir. 2/6/19), 272 So. 3d 552, 556. Under the manifest error standard, this Court does not decide whether the factfinder was right or wrong; rather, we are required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. *State in Interest of H.R.*, 2021-1328 (La. App. 1 Cir. 2/25/22), 341 So. 3d 592, 598.

In this case, the trial court terminated K.J.'s parental rights under La. Ch.C. art. 1015(4)(b), which provides:

5

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

* * *

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

At the termination hearing, K.C.N.'s former DCFS case manager testified that K.J.'s identity as K.C.N.'s father was unknown at the time K.C.N. entered the State's custody in April of 2022. She testified that throughout K.C.N.'s time in State custody, approved case plans required the parents to make parental contributions toward the cost of foster care of K.C.N. in the amount of $25.00 per month. She further testified that she believed K.C.N.'s mother identified K.J. as the potential father at the permanency hearing in April of 2023, that K.J. first "got in touch with [her]" in May of 2023, and his paternity was officially confirmed in June of 2023. She testified regarding a telephone conversation she had with K.J. on or about July 5, 2023 to advise him of his paternity, at which time she informed him of his obligation to make parental contribution payments in the amount of $25.00 per month. She testified that she met with K.J. on August 7, 2023, at which time she provided K.J. with a copy of K.C.N.'s case plan. That case plan contained the obligation that K.J. "pay $25.00 per month in parental contributions via money order beginning from the month of custody[,] April 2022." The former case manager further testified that K.J. made his first parental contribution payment on January 29, 2024.[4] Finally, the former case manager agreed that freeing K.C.N. for adoption was in the child's best interest.

---

[4] The record reflects that on January 29, 2024, K.J. delivered four money orders, each in the amount of $25.00, to DCFS for the care of K.C.N. The former case worker testified there was no prohibition on paying parental contributions in a lump sum payment. However, we note that payment in a lump sum is not the issue herein; it is whether K.J. failed to provide significant contributions to K.C.N.'s care and support for any period of six consecutive months. See La. Ch.C. art. 1015(4)(b).

6

K.J. also testified at the hearing. He stated that K.C.N.'s maternal grandmother informed him in May of 2023 that there was a possibility that he was K.C.N.'s father, and he reported to the DCFS office for DNA testing. K.J. testified that he met with the DCFS case worker in August of 2023 and was told of the requirements of the case plan, but he did not know of his obligation to make parental contribution payments until he met with an attorney after that time. K.J. stated that the first contributions he made for K.C.N.'s support were in January 2024 because he was unable to visit with K.C.N. in December 2023. K.J. testified that he desired to be involved in K.C.N.'s life, just like he was involved in his other children's lives.

K.C.N.'s CASA volunteer also testified at the hearing. She testified that K.J.'s last bonding appointment with K.C.N. had been April 25, 2024, which was his last official visit with K.C.N. In providing more context for the court, the CASA volunteer testified that K.J. did not attend the visits scheduled for February 28, 2024 or March 28, 2024. K.J. did appear for a visit scheduled May 30, 2024, but did not await the arrival of K.C.N. The CASA volunteer further testified that on June 27, 2024 "he" was not able to attend, but it is unclear whether she meant K.J. or K.C.N.; and she testified that K.J. had not requested to visit with K.C.N. in July of 2024. At the time of the hearing in September 2024, K.C.N. had not visited with K.J. for the last five months, and at this point, the CASA volunteer did not see the benefit for K.C.N. in continuing these sporadic visits. In contrast, the CASA volunteer testified as to K.C.N.'s growth and development in his foster home, where he has an older sibling whom he emulates, and parents he loves. The CASA volunteer testified that she believed it was in the best interest of K.C.N. that K.J.'s parental rights be terminated.

In its written reasons, the trial court found that although K.J. did not formally become a party to the proceedings until July of 2023, he had become aware of the possibility of his paternity before then, and noted that the record contained a form

7

for submission of DNA testing material for K.J. on June 6, 2023. The trial court noted that La. Ch.C. art. 1015(4)(b) requires that a parent seeking to avoid termination for abandonment make "significant contributions" to the child's care. The trial court further noted that the evidence at trial showed that K.J. first made a payment by means of several $25.00 money orders on January 29, 2024.[5] The trial court continued:

> [K.J.] argues that he wasn't aware of his obligations until August, 2023 and therefore that date should start the six month delinquency period. This argument ignores his earlier conversations with [K.C.N.'s] Mother, Grandmother and DCFS about his possible paternity and the June confirmation of that paternity. Furthermore, the Case Plan informs that Father that his obligations start on the date the Child entered custody, in April, 2022. Clearly, $125.00 paid in January, 2024 does not satisfy his obligations of support of $25 per month from April, 2022 to the date of that payment. (Footnote omitted.)

The trial court found by clear and convincing evidence that K.J. abandoned the child pursuant to La. Ch.C. art. 1015(4)(b) by failing to make the required significant financial contributions to K.C.N.'s care and that it was in K.C.N.'s best interest that K.J.'s parental rights be terminated and K.C.N. be freed for adoption.

On appeal, K.J. argues that he first acknowledged receipt of a case plan on August 7, 2023, and that this case plan was not approved by the trial court until November 29, 2023. Therefore, he argues November 29, 2023 was the first day that K.J. was court ordered to pay support payments to K.C.N., and the six-month period for calculating the abandonment period under La. Ch.C. art. 1015(4) did not commence until that date. K.J. cites two cases in support of this argument. In *State in Interest of C.A.C.*, 2011-1315 (La. App. 4 Cir. 2/1/12), 85 So. 3d 142, 148 <u>writ denied</u>, 2012-0388 (La. 3/7/12), 83 So. 3d 1048, the father was incarcerated at the time his child was placed in DCFS custody. The Fourth Circuit Court of Appeal concluded that the six-month period for calculating the abandonment period under

---

[5] As noted above, K.J. delivered four $25.00 money orders.

8

La. Ch.C. art. 1015(4) could not commence until DCFS established that the father had actual notice that the child was placed in state custody and was provided a copy of his case plan. The court found that "[i]t would be fundamentally unfair to find a failure to support based on a period during which [the father] was not notified that his child had been placed into state custody and that he had an obligation to pay child support." *Id.* at 149. In *State in Interest of K.A.S.*, 53,613 (La. App. 2 Cir. 9/23/20), 303 So. 3d 688, the Second Circuit Court of Appeal found that the mother was provided a copy of the case plan in November of 2018 and the trial court approved the case plan in December of 2018. Thus, the court found that the record did not support a finding that the mother failed to pay the parental contributions required by the case plan for a period of six consecutive months before the termination petition was filed in February 2019. *Id.* at 692.

These cases are clearly distinguishable from the case at hand. The record reflects that K.J. had knowledge that K.C.N. was in DCFS custody as early as May of 2023, when K.C.N.'s maternal grandmother informed him that there was a possibility that he was K.C.N.'s father and he reported to the DCFS office for DNA testing. The former case manager testified that she advised K.J. of his paternity of K.C.N. on July 5, 2023, and informed him at that time of his obligation to make parental contribution payments in the amount of $25.00 per month. K.J. made his first parental contribution on January 29, 2024. The petition for termination of K.J.'s parental rights was not filed until June 7, 2024, asserting K.J. failed to provide significant contributions to K.C.N.'S care and support from July 5, 2023 through January 29, 2024.

Under the plain language of La. Ch.C. art. 1015(4)(b), the intent to permanently avoid parental responsibility is demonstrated by the parent's failure to provide significant contributions to the child's care and support for any period of six consecutive months. *State in Interest of H.R.*, 2021-1328 (La. App. 1 Cir. 2/25/22),

9

341 So. 3d 592, 599. The trial court made a factual finding that K.J. was aware of his support obligation "more than seven months prior" to making his first payment, based on evidence in the record of conversations with K.C.N.'s mother and grandmother and DCFS about his possible paternity, and the June confirmation of that paternity. Moreover, the trial court found that his January 29, 2024 payment of either $100.00 or $125.00 did not satisfy all of his obligations going back to April 2022.

Whether termination is warranted is a question of fact, and a trial court's factual determinations should not be set aside in the absence of manifest error. *State in Interest of E.O.*, 272 So. 3d at 556. Based upon the entire record, a reasonable factual basis exists for the trial court's finding that K.J. was aware of his support obligation and failed to provide significant contributions to the child's care and support for the period from July 5, 2023 through January 29, 2024, a period in excess of six consecutive months. Moreover, to credit K.J. with this single lump sum payment made after a period of six consecutive months of failing to pay, resulting in the child remaining in foster care, runs afoul of the state and federal mandates to further the best interests of the child. See *State in Interest of C.F.*, 235 So. 3d at 1076. Thus, the trial court did not err in finding the State proved by clear and convincing evidence the statutory ground of abandonment. See La. Ch.C. art. 1015(4)(b).

We also find no error in the trial court's determination that termination of K.J.'s parental rights is in the best interest of K.C.N. The trial court noted that K.C.N. had been in the custody of a loving family since he was merely days old, who have indicated a desire to adopt K.C.N. The trial court recognized that K.C.N.'s relationship with K.J. had been one of infrequent visits at the DCFS office and not in any home setting offered by K.J. as an alternative to that of K.C.N.'s foster family. The trial court recognized that while K.J. may have "some sense of pride in having

fathered this, his either thirteenth or fourteenth child," balancing that pride against K.C.N.'s need for stability by freeing him for adoption by the only family he has ever known, "clearly mandates that termination is the only just result."

After considering the entire record, we find a reasonable factual basis exists for the trial court's finding that termination of K.J.'s parental rights was in the best interest of K.C.N. Thus, we find no error in the trial court's judgment terminating K.J.'s parental rights.

## CONCLUSION

For the reasons set forth above, the trial court's October 7, 2024 judgment terminating the parental rights of K.J. is affirmed. All costs are assessed to K.J.

**AFFIRMED.**

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2025 CJ 0167

STATE OF LOUISIANA
IN THE INTEREST OF K.C.N.



**FIELDS, J.**, dissents and assigns reasons.

I respectfully dissent from the majority's opinion, as I find the trial court erred in finding the State proved an alleged ground for termination of K.J.'s parental rights by clear and convincing evidence.

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. The permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. **In the Interest of A.L.**, 2010-2100 (La. App. 1st Cir. 3/25/11), 2011 WL 1260074, *1 (unpublished), writ denied, 2011-0730 (La. 5/6/11), 62 So.3d 129, citing **State ex rel. A.T.**, 2006-0501 (La. 7/6/06), 936 So.2d 79, 82. However, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. **In the Interest of A.L.**, 2011 WL 1260074 at *1. As a result, the legislature has imposed strict procedural and evidentiary requirements that must be met before parental rights can be terminated. **State, in Interest of GA**, 94-2227 (La. App. 1st Cir. 7/27/95), 664 So.2d 106, 110.

Involuntary termination of parental rights is a two-part inquiry. First, the State must prove at least one statutory ground for termination by clear and convincing evidence. See La. Ch. Code arts. 1015 and 1035(A). That is, the State must prove the existence of the ground for termination is highly probable. See **State in Interest of A.L.D.**, 2018-1271 (La. 1/30/19), 263 So.3d 860, 863.

Second, after the State proves a ground for termination, the trial court must also determine whether termination is in the child's best interest. See La. Ch. Code art. 1037(B); **State in Interest of A.L.D.**, 263 So.3d at 863; **State in Interest of A.B.**, 2023-0655 (La. App. 1st Cir. 1/19/24), 383 So.3d 933, 939, writ denied, 2024-0021 (La. 3/7/24), 30 So.3d 552.

In the case before us, I find the State failed to prove the ground for termination presented in its petition for termination of K.J.'s parental rights, *i.e.*, failing to provide significant contributions to K.C.N.'s care and support for the period of July 5, 2023 through January 29, 2024. Although the record shows that K.J. was informed of his monthly support obligation on behalf of K.C.N. in July of 2023, he was not informed of how or where to make those payments until he received a copy of K.C.N.'s case plan on August 7, 2023. Thus, I find that K.J. had notice of his support obligation in August 2023, once he was aware of both the obligation itself, and how to fulfill it. Admittedly, K.J. did not make his first support contributions until January 29, 2024; however, those contributions equaling four monthly payments, were made within the sixth month of K.J.'s support obligation, and found to be acceptable by DCFS. Because the termination of parental rights is predicated on the existence of one of the statutory grounds set forth in La. Ch. Code art. 1015, which I find the State failed to prove, there can be no further inquiry regarding whether termination is in the best interest of the child. For these reasons, I would reverse the trial court's October 7, 2024 judgment terminating K.J.'s parental rights and remand the matter for further proceedings.

2